**In re Gary Stuart LOWENSTEIN, Debtor.**

**No. 03–14502–JNF.**

United States Bankruptcy Court, D. Massachusetts.

Feb. 12, 2007.

Neil D. Warrenbrand, Law Offices of Neil D. Warrenbrand, Boston, MA, for Debtor.

Jeffrey D. Ganz, Joseph Braunstein, Meegan Casey, Riemer & Braunstein LLP, Boston, MA, for Trustee.

**MEMORANDUM**

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matter before the Court is the "Objection by the Cadle Company and Cadles of Grassy Meadows, II, L.L.C. to Trustee's Final Account and Report before Distribution, Request for Compensation, and Report on Claims and Proposed Distribution." Through their Objection, The Cadle Company and Cadles of Grassy Meadows, II, L.L.C. (collectively, "Cadle") object to the Chapter Trustee's proposed distribution of proceeds of a settlement to the United States as the holder of a secured claim. The United States filed an Opposition to Cadle's Objection, and the Court

heard the dispute on November 9, 2006.[1] Cadle and the United States filed briefs in support of their respective positions in mid-December, 2006. Neither party requested an evidentiary hearing either at the hearing or in their briefs, and the facts necessary to decide the matter are undisputed.

The issue presented is whether the prepetition lien of the United States, which attached to all property of the Debtor, also attached to funds obtained by the Trustee from the Debtor's spouse in settlement of avoidance actions he commenced against the Debtor, the Debtor's spouse, and various third parties.

## II. BACKGROUND

On May 28, 2003, the Debtor filed a voluntary Chapter 7 petition. Other than exempt personal property with little monetary value, the Debtor listed no assets. On Schedule E–Creditors Holding Unsecured Priority Claims, he listed a single creditor, the United States Department of Justice, with a claim in the sum of $1,800,000.00. On Schedule F–Creditors Holding Unsecured Nonpriority Claims, the Debtor listed a number of creditors, including Cadle and the Federal Deposit Insurance Corporation, the latter with a claim in excess of $1.6 million.

Prior to the commencement of the Debtor's bankruptcy case, the United States Attorney for the District of Rhode Island filed a criminal information against the Debtor, a certified public accountant and real estate investor, charging him with bank fraud and conspiracy to commit bank fraud. On January 12, 1996, the United States District Court for the District of

Rhode Island sentenced the Debtor to 15 months imprisonment to be followed by three years of supervised release. Additionally, the court ordered the Debtor to pay restitution in the sum of $1,211,308.00. Judgment entered against the Debtor on January 19, 1996. To secure the restitution award, on or around June 10, 1996, the Department of Justice filed a "Notice of Lien for Fine Imposed Pursuant to the Sentencing Reform Act of 1984." The Notice provided:

Notice is hereby given of a lien against the property of the defendant named below. Pursuant to Title 18, United States Code, Section 3613(a), a fine imposed pursuant to the provisions of subchapter C of chapter 227 is a lien in favor of the United States upon all property belonging to the person fined. Pursuant to Section 3613(d), a notice of lien shall be considered a notice of lien for taxes for the purposes of any State or local law providing for the filing of a tax lien. The lien arises at the time of the entry of judgment and continues until the liability is satisfied, remitted, or set aside, or until it becomes unenforceable pursuant to Section 3613(b).

Approximately six months after the Debtor filed his petition, the Chapter 7 Trustee filed a "Complaint to Avoid Fraudulent Conveyances" (Adv. P. No. 03–1492) against the Debtor and three other individuals: Janice M. Lowenstein, the Debtor's spouse; Daniel Torre, Trustee of the P.A. Holding Trust; and Richard Thomas, Trustee of the RT Realty Trust. Citing 11 U.S.C. §§ 544(b) and 550, and Mass. Gen. Laws ch. 109A, § 1 *et seq.*

---

1. Neither Cadle nor the United States takes issue with the Trustee's proposed distributions for his commission and expenses ($18,-237.17), his counsel's fees and expenses ($138,281.56), his accountant's fee ($3,990.00), and miscellaneous filing fees ($150.00) which total $160,798.73. The Court approved these disbursements at the hearing held on November 9, 2006.

(repealed 1996),[2] the Trustee, through his Complaint, sought to avoid the following transfers and to recover the property transferred or its value: 1) the March 1, 1990 transfer of property located at 81 Harbor Road, Yarmouth, Massachusetts from Gary S. Lowenstein and Janice M. Lowenstein to Janice M. Lowenstein; 2) the February 28, 1990 transfer of property located at Edgewater Place, Unit 502, 133 Commander Shea Boulevard, Quincy, Massachusetts from Gary S. Lowenstein and Janice M. Lowenstein to Daniel Torre, Trustee of the P.A. Holding Trust; 3) the February 28, 1990 transfer of property located at Sagamore Place, Unit 402, 115 W. Squantum Street, Quincy, Massachusetts from Gary S. Lowenstein and Janice M. Lowenstein to Daniel Torre, Trustee of the P.A. Holding Trust; and 4) the June 3, 1993 transfer of property located at 37–39 Oxford Road, Norwood, Massachusetts from Gary S. Lowenstein, Janice M. Lowenstein and Richard Thomas to Richard Thomas, Trustee of the RT Realty Trust.

Although Cadle filed numerous motions to extend the time within which to file a complaint under 11 U.S.C. §§ 523 and 727, it failed to request a further extension before March 31, 2005, the deadline set forth in its last request for an extension, and the period within which it had to file a complaint expired. Neither the Trustee nor any other creditors, including the United States, filed complaints objecting to the Debtor's discharge or the dischargeability of any debts. Thus, on April 4, 2005, the Debtor received a discharge.

On May 20, 2005, less than two months after the Debtor received his discharge, the Trustee filed a Complaint captioned, "Complaint to Avoid Fraudulent Conveyance" (Adv. P. No. 05–01363), against the Debtor, Janice M. Lowenstein, and John J. O'Dea ("O'Dea"), identified in the Complaint as an employee of Gary S. Lowenstein, P.C. Through his Complaint, the Trustee requested that the conveyance of Business Financial Services, Inc. ("BFS"), the Debtor's former accounting firm and a successor to the accounting firm of Gary S. Lowenstein, P.C., to O'Dea, and then, in part, to Janice Lowenstein, be avoided as a fraudulent conveyance and that the value of BFS be recovered from O'Dea and Janice Lowenstein. The Trustee further requested that the conveyance to Janice Lowenstein of the Debtor's right to receive consideration in exchange for the conveyance of BFS to O'Dea in the form of 40% of the yearly income generated by BFS be avoided as fraudulent and that the consideration, payments in excess of $500,000.00, be recovered from Janice Lowenstein. Finally, the Trustee sought an order requiring Janice Lowenstein to turnover the consideration she received from BFS.

Within two months of filing the second adversary proceeding, the Trustee filed a Motion for Approval of Stipulation Resolving Adversary Proceedings (the "Settlement Motion"), pursuant to which he requested approval a settlement which would result in a payment to the bankruptcy estate of $430,000.00 in full satisfaction of the Trustee's claims against all the defendants in both adversary proceedings. The

---

**2.** Massachusetts repealed the Uniform Fraudulent Conveyance Act ("UFCA") in 1996 and replaced it with the Uniform Fraudulent Transfer Act ("UFTA"). 1996 Mass. Acts 157 (effective Oct. 8, 1996). Both acts have the same chapter number, Mass. Gen. Laws ch. 109A. The UFTA is not to be applied retroactively. Conveyances which took place during the pendency of the UFCA are governed by that Act. *Fed. Refinance Co., Inc. v. Klock,* 352 F.3d 16, 22 n. 2 (1st Cir.2003) (citations omitted); *Carpenter v. Granderson (In re Granderson),* 214 B.R. 671 (Bankr.D.Mass.1997); *First Fed. Sav. & Loan Ass'n of Galion, Ohio v. Napoleon,* 428 Mass. 371, 701 N.E.2d 350 (1998).

Trustee represented that it was his belief that the settlement was in the best interests of the bankruptcy estate and reasonably reflected the merits of, and defenses to, his claims. He also represented that the amount of the settlement accounted for the net realizable value of the fraudulently conveyed assets, the competing claims to ownership of the assets by Janice Lowenstein and Richard Thomas, the defenses raised by the defendants, and the risks and expenses associated with bringing the fact intensive disputes to trial.

In the Settlement Motion, the Trustee set forth detailed information about the Debtor's bankruptcy case, including his Schedules in which he "claimed to have no direct or indirect ownership interest in any real property." He also claimed to have no direct or indirect interest in either the P.A. Holding Trust or the RT Realty Trust.[3]

In his Settlement Motion, the Trustee listed real property in which the Debtor was the record owner before February 27, 1990. These properties included the four properties identified in the Trustee's first Complaint as well as several others, including rental property located at Edgewater Place, Unit 419, 133 Commander Shea Boulevard, Quincy, Massachusetts; 16 Foster Street Condominiums, Unit 7, 16 Foster Street, Boston, Massachusetts; and Units B34, B35, and B38 in the Four Elms Condominiums, 200 Manville Hill Road, Cumberland, Rhode Island. Additionally, the Trustee outlined the Debtor's criminal activities, which occurred between 1988 and 1990, and involved the submission of false tax returns to federally insured financial institutions, as well as the Debtor's transfers of his interests in the Harbor Road property and the rental properties for no consideration in early 1990 and in

1993, prior to the decision of the United States Attorney for the District of Rhode Island to file a criminal information against him in 1995.

The Trustee disclosed in his Settlement Motion that the Debtor was a certified public accountant and conducted a private accounting practice through BFS as its sole owner. According to the Trustee, the Debtor conveyed BFS to O'Dea in 1996 shortly before his incarceration for no consideration, although after the transfer O'Dea caused BFS to pay more than $500,000.00 to Janice Lowenstein, 70% as wages which were reported on a form W–2 to the Internal Revenue Service and 30% characterized by O'Dea in BFS's books and records as "Equipment Rent." O'Dea paid additional sums directly to the Town of Yarmouth and to Security Federal Savings and Loan Association in satisfaction of the real estate taxes and mortgage payments owed with respect to the Harbor Road property.

In the Settlement Motion, the Trustee set forth the defenses asserted by the defendants in the adversary proceedings he commenced. According to the Trustee, the defendants maintained the transfers were made "to allow record title of the subject properties to reflect the true owners of the real estate." The Trustee stated that the Debtor represented that he was solvent at the time of the transfers and able to pay his bills and that Janice Lowenstein, the P.A. Holding Trust and the RT Realty Trust maintained that they paid the acquisition price for the properties, as well as maintenance costs.

According to the Trustee, he conducted discovery and learned that both before and after the transfers the rental properties "appear to have been managed and ulti-

---

**3.** The Court is empowered to judicial notice of its own records. *See Xytest Corp. v. Mitch-* *ell (In re Mitchell),* 255 B.R. 97, 104 (Bankr. D.Mass.2000).

mately owned by an entity known as T & L Company ("T & L")." T & L was a partnership whose assets were originally owned by the Debtor, Janice Lowenstein and Richard Thomas. Richard Thomas held a 50% ownership interest both before and after the transfers. Janice Lowenstein, who once shared a 50% ownership interest with the Debtor, became the sole owner of a 50% interest after the transfers.

The Trustee represented that Janice Lowenstein "incurred significant expenses" to improve and maintain the Harbor Road property and that T & L also incurred significant expenses. The Trustee learned through discovery that on August 29, 2002, less than one year before the Debtor filed his Chapter 7 petition, the P.A. Holding Trustee received $116,913.00 from "what appears to have been an arms-length sale of 419 Edgewater Place to an unrelated, third party." He also learned that, on September 23, 2003, it received $132,913.00 from a sale of 502 Edgewater Place to an unrelated third party. Additionally, the Trustee summarized the cash flow of the rental properties, stating the following:

> [T]he books and records of T & L appear to reflect that, during 2003 and much of 2004, Sagamore Place, Foster Street, Oxford Road, and the Cumberland Units, were generating an approximate total of $4,970 to $6,400 each month in rental income. During this same period, T & L appears to have been incurring monthly expenses associated with the maintenance of these properties in an approximate range from $3,300 to $12,200. Among other things, T & L's cash flow records revealed that the Rental Properties generated, on average, net annual cash flow of $6,821.00 during the five year period from 2000 to 2004 (based on a range from a low of

negative $7,333.00 in 2004 to a high of positive $18,114 in 2003).

With respect to the accounting practice which the Debtor transferred to O'Dea, the Trustee reported that the defendants asserted that BFS had little or no value at the time the Debtor transferred his interest to O'Dea and that the Debtor did not intend to sell and O'Dea did not intend to buy BFS.

The Trustee also explained in his Settlement Motion the basis for his decision to accept $430,000.00 in satisfaction of his claims. Upon consideration of various appraisals and other evidence, the Trustee determined to accept payment of $430,000.00 from Janice Lowenstein "in exchange for a complete release by the Trustee of all claims against the Defendants." To secure the settlement amount, the Trustee obtained an Agreement for Judgment in Adv. P. No. 03–1492 in the sum of $450,000.00 against the Debtor, Janice Lowenstein, the P.A. Holding Trust, the RT Realty Trust, T & L Company, and Cumberland Elms Corporation, jointly and severally. He also obtained an Agreement for Judgment in Adv. P. No. 05–1363 in the sum of $30,000.00 against the Debtor and Janice Lowenstein, jointly and severally. Upon payment of the settlement amount, the Trustee agreed to destroy the Agreements for Judgment.

The Trustee served the Motion for Approval of Stipulation Resolving Adversary Proceedings on Christopher R. Donato, Esq., Special Assistant U.S. Attorney at One Courthouse Way in Boston, Massachusetts, as well as Michael Iannotti, Esq., an attorney with the U.S. Attorney's Office in Providence, Rhode Island. Upon receipt of the Settlement Motion, the Court issued a Notice of Nonevidentiary Hearing, which directed the Chapter 7 Trustee to serve all creditors with notice that a hearing on the Settlement Motion was

scheduled for September 21, 2005 at 10:00 AM and that objections or responses to the Settlement Motion were to be filed no later than September 8, 2005 at 4:30 PM. On July 15, 2005, the Trustee served the Notice on Assistant U.S. Attorneys in Boston and Providence, providing them with more than a twenty day notice of the proposed settlement. *See* Fed. R. Bankr.P. 2002(a)(3). On September 20, 2005, in the absence of objections, the Court approved the Settlement Motion and canceled the hearing scheduled for the next day.

Prior to approval of the Settlement Motion, on March 22, 2005 and July 8, 2005, the United States and Cadle, respectively, filed proofs of claim. Christopher R. Donato, Esq., on behalf of the United States, filed a secured proof of claim in the sum of $1,164,808.00 for "Restitution to a Federal Agency" in which he disclosed the existence of collateral valued at $641,600.00. On July 16, 2003, Cadle filed an unsecured claim in the amount of $489,592.58 as liquidating agent for First Mutual Bank for Savings. On August 18, 2004, it filed an unsecured claim in the amount of $817,349.17, as assignee of the Federal Deposit Insurance Corporation as Receiver for Bank of New England. The Trustee did not object to the secured claim of the United States. He also did not object to Cadle's claims. Cadle represented that it was unaware of the Trustee's proposed treatment of the United States' proof of claim until he filed his final report.

On August 25, 2006, the Trustee filed his Final Report, disclosing, for the first time, his intention to disburse the settlement proceeds, after payment of administrative expenses, to the United States. Cadle filed a timely Objection, raising for the first time an issue as to whether the lien of the United States attached to the settlement proceeds obtained by the Trustee. If the Court were to sustain Cadle's Objection, Cadle and the United States would share the settlement proceeds pro rata with other unsecured creditors.

## III. POSITIONS OF THE PARTIES

### A. *Cadle*

Cadle maintains that when the United States obtained and recorded its lien in 1996 the Debtor had completed the transfer of all of his real estate. It adds that when the Trustee settled the adversary proceedings none of the defendants conceded that the transfers were fraudulent and that there were no judgments determining that the transfers were void. Relying upon *United States v. V & E Eng'g & Constr. Co., Inc.*, 819 F.2d 331, 333 (1st Cir.1987), Cadle argues that the lien of the United States attaches only to real or personal property that the debtor owns at the time the lien becomes effective and that once a debtor sells property there is no interest on which the government's lien could attach. It adds, citing *Thomson v. United States*, 66 F.3d 160, 162 (8th Cir. 1995), that it is well settled that a federal tax lien does not extend or attach to creditors' rights or remedies against the debtor. Cadle relies upon *In re Southeast R.R. Contractors, Inc.*, 235 B.R. 619, 622 (Bankr.E.D.Tenn.1996), a case in which the court ruled that a pre-petition lien of the IRS did not attach to preference recoveries, finding that the preference recoveries belonged to the bankruptcy estate, not the taxpayer.

Cadle also argues that "[e]ven had the United States' lien been recorded before the properties were transferred, the proceeds held by the Trustee do not specifically result from avoidance of any transfers or from sales of any properties subject to avoidance claims; instead, the proceeds represent a cash settlement of disputed claims." Citing *Callahan v. Internal Revenue Service (In re Ball)*, No. 7–99–02518–

WSA, 2004 WL 909441 (Bankr.W.D.Va. Mar. 10, 2004), Cadle states that the United States submitted no evidence that the settlement proceeds can be traced to property on which its lien attached, although it observes that one of the transfers which the Trustee sought to avoid was the Debtor's interest in his accounting practice, which may have occurred after the Unites States filed its lien. Finally, Cadle maintains that, under the fraudulent conveyance statute in effect when the Trustee brought his fraudulent conveyance claims, transfers were voidable, not void *ab initio* so that the lien cannot reach back to the date of the initial transfer.

## B. *The United States*

The United States prefaces its argument by stating that its criminal restitution claim is nondischargeable pursuant to 11 U.S.C. § 523(a)(13) and that it can pursue collection of its claim notwithstanding the Debtor's discharge. It also states, and it has not been disputed, that the Notice of Lien resulting from the restitution order against the Debtor was properly filed with the Registry of Deeds for Barnstable County, Massachusetts and with the Clerk for the United States District Court for the District of Massachusetts. Citing *Glass City Bank of Jeanette, Pa. v. United States*, 326 U.S. 265, 268, 66 S.Ct. 108, 90 L.Ed. 56 (1945)("the lien applies to property owned by the delinquent taxpayer at any time during the life of the lien"), it concludes that "[t]he lien, therefore, has been perfected and attaches to all of Low-

enstein' s real and personal property, whether acquired prior to or after the filing of the Notice of Lien."

The United States also argues that "[a]s the proceeds of property fraudulently conveyed, paid to settle the fraudulent conveyance actions brought by the trustee, the $430,000.00 is property of the estate and is subject to the claims of creditors, 'the priority of which is to be determined by the applicable state law except where the Bankruptcy Act provides otherwise.' " *Claussen Concrete Co., Inc. v. Walker (In re Lively)*, 74 B.R. 238, 239 (S.D.Ga.1987).[4]

The United States cites a number of cases in support of its position, including *In re Amtron, Inc.*, 192 B.R. 130, 132 (Bankr.D.S.C.1995). In *Amtron*, the court decided the issue of whether a federal tax lien attached to patent rights where lien notices were filed in 1989 after the fraudulent transfer of property in 1986. Under applicable South Carolina law, fraudulent transfers are void and of no effect. Thus, the court determined that the property recovered by the bankruptcy trustee was subject to the tax lien which had attached well before the bankruptcy.

The United States also relies upon *In re Romano*, 51 B.R. 813, 814 (Bankr.M.D.Fla. 1985), in which the court noted that "[u]nder Florida law the legal title to fraudulently transferred property never passes from the transferor." Based upon these cases, the United States concludes that its lien attached to all of Lowenstein's proper-

---

**4.** In *Lively*, the district court, in reversing the bankruptcy court, ruled that a judicial lien attached to settlement proceeds obtained from the trustee's sale of property that allegedly was fraudulently conveyed by a corporation owned entirely by the debtor to the debtor's spouse. The court stated that "[a]s proceeds from the sale of property properly within the estate under Section 541, the fund is subject to the claims of creditors, the pri-

ority of which is to be determined by applicable state law except where the Bankruptcy Act provides otherwise." 74 B.R. at 239. The district court ruled that under Georgia law, the creditor's judgment lien extended to after-acquired property and was superior to the claims of unsecured creditors or the trustee's hypothetical lien which arose at the commencement of the case. *Id.*

ty, including the property fraudulently transferred prior to the filing of the lien. It adds: "The Trustee's recovery of the fraudulently transferred property (or the proceeds thereof) in the form of the $430,000 payment has no effect on the secured interest of the United States in that property." Finally, it asserts, without authority, that its lien would attach to the settlement proceeds even if the lien did not attach to the fraudulent transferred property.

## IV. DISCUSSION

■ Under Fed. R. Bankr.P. 3001(f) a properly filed proof of claim is prima facie evidence of the validity and amount of the claim. The Trustee never objected to the proof of claim filed by the United States. Cadle represented that it was unaware of the Trustee's decision not to object to the claim until he filed his Final Report. Pursuant to 11 U.S.C. § 502, "[a] claim that has been allowed or disallowed may be reconsidered for cause." As noted by the court in *In re Southeast R.R. Contractors, Inc.*, 235 B.R. at 621, "[o]nce a colorable challenge to the claim has been made . . . the burden of going forward shifts to the creditor who must then prove its claim."

■ The Court finds that Cadle has succeeded in establishing more than a colorable challenge to the secured claim of the United States in the settlement proceeds obtained by the Trustee. Moreover, in the absence of an objection to the government's claim by the Trustee, the Court finds that Cadle has standing to pursue its Objection, as, absent a ruling in its favor, it will not receive a dividend in the Debtor's Chapter 7 case. *See Kowal v. Malk-*

*emus (In re Thompson)*, 965 F.2d 1136, 1147 (1st Cir.1992).

■ The Court rejects the arguments advanced by the United States. The cases upon which it relies are readily distinguishable from the facts of the instant case. Not only is Massachusetts law unlike the state laws referenced in the decisions cited by the United States, the settlement proceeds in this case cannot be traced to specific, proven fraudulent transfers.

In the first place, the Debtor transferred his interests in real property three to six years before the entry of judgment against him in the criminal case commenced by the United States Attorney in Rhode Island and the creation of the lien in favor of the United States. The timing of the Debtor's transfer of BFS to O'Dea is less clear, however, and the lien of the United States may have attached to the Debtor's interest in that entity.[5]

Secondly, the Trustee did not avoid any fraudulent transfers; none of the defendants admitted liability; and only Janice Lowenstein paid monies to settle the Trustee's claims in exchange for a release for herself and the other defendants. This Court made no determination that the Debtor, in fact, had fraudulently transferred assets, and, in approving the settlement, this Court made no determination as to the source of the monies paid to the estate by Janice Lowenstein. She could have obtained the monies from income from the fraudulently transferred properties. Alternatively, she could have obtained the monies from her savings, from income from her employment, from a loan from a relative, or from a winning lottery ticket. Accordingly, the assertion of the

---

**5.** The lien would attach to the Debtor's shares in the corporation. Arguably, if the Debtor used the corporation as a vehicle for his criminal activities and it was his alter ego, the lien would attach to the assets of the corporation, including its accounts receivable. The United States did not advance that argument or request an evidentiary hearing.

United States that it has a lien on the settlement proceeds does not withstand scrutiny.

The decision of the court in *Callahan v. Internal Revenue Service (In re Ball)*, No. 7–99–02518–WSA, 2004 WL 909441 (Bankr.W.D.Va. Mar. 10, 2004), supports the conclusion that the lien United States did not attach to the settlement proceeds. In that case, relatives of the debtor transferred property into a spendthrift trust for the debtor's benefit both before and after the IRS recorded notices of federal tax liens against the debtor. The Chapter 7 trustee of the debtor's bankruptcy estate challenged the spendthrift trust as a sham by filing an adversary proceeding against the trustee of the spendthrift trust seeking turn over of the trust property. The Chapter 7 trustee and the trustee of the spendthrift trust settled the trustee's claims for a payment of $150,000 to the estate from sale of the trust and the execution of releases. The court in Ball determined that the IRS never requested it to take judicial notice that the trust property had belonged to the debtor. Additionally, the IRS did not object to the settlement. The court concluded:

> Because the Trustee's adversary proceeding brought against the "spendthrift trust" resulted in a settlement, the validity of such trust has never been tested in court. There is no disputing that the tax lien accorded to the IRS by 26 U.S.C. § 6321 is remarkably powerful and comprehensive. It extends even to property which under state law would not be subject to the claims of other creditors. *See Drye v. United States,* 528 U.S. 49, 120 S.Ct. 474, 145 L.Ed.2d 466 (1999) (disclaimed property). *United States v. Craft,* 535 U.S. 274, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002) (tenancy by the entirety property). Nevertheless, there remains some obligation upon the IRS to establish that its challenged lien did attach to the property which the "spendthrift trust" used as consideration for the settlement and the release of the Trustee's claim. Based on the Stipulation agreed to by the parties, there is no evidence before the Court or which has been cited by the IRS that would establish that it ever had a lien upon the Washington County property which the Balls' son and daughter conveyed to the trust and the proceeds of which were used to provide the money for the settlement with the Bankruptcy Trustee. In such circumstances it is not the responsibility of the Court to inquire whether such evidence might exist. Accordingly, there is no basis for the Court to determine that there was any lien upon property which came out of that trust into the Trustee's hands to pay for the settlement.

2004 WL 909441 at *3.

In the present case, the United States was provided with ample notice of the terms of the Trustee's proposed settlement with the defendants. The Trustee disclosed his reasons for and the terms of his proposed settlement in great detail in the Settlement Motion, which he properly served on the United States. The Trustee, at the Court's direction, provided the United States with a specific deadline for voicing any objections to the Settlement Motion. The United States could have, but did not, object to the Settlement Motion or seek clarification as to whether its lien attached to the $430,000.00 paid to the estate by Janice Lowenstein. It took no action.

█  Additionally, in cases such as *In re Amtron, Inc.,* 192 B.R. 130 (Bankr.D.S.C. 1995), and *In re Romano,* 51 B.R. 813 (Bankr.M.D.Fla.1985), which the United States cites in support of its position, the state law upon which the courts relied is

markedly different from Massachusetts law. In *Amtron,* South Carolina law provided that the fraudulent transfers in question were void *ab initio, see* 192 B.R. at 132, and, in *Romano,* Florida law provided that legal title to fraudulently transferred property never passed from the transferor, *see* 51 B.R. at 814. Under the Massachusetts version of the Uniform Fraudulent Conveyance Act in effect at the time of the transfers, fraudulent conveyances though voidable were not void. *See* Mass. Gen. Laws ch. 109A, § 9 (repealed); *see also Service Mortg. Corp. v. Welson,* 293 Mass. 410, 413, 200 N.E. 278 (1936). Accordingly, even assuming the settlement proceeds could be traced to the Debtor's property, absent a judgment in favor of the Trustee avoiding the transfers, the real property transferred did not belong to the Debtor at the time the lien in favor of the United States arose, at the commencement of the bankruptcy case, or at the time the Settlement Motion was approved by the Court.

In *Thomson v. United States,* 66 F.3d 160 (8th Cir.1995), the court interpreted 26 U.S.C. § 6321, the statute upon which the United States relies for its assertion that its lien attached to all the Debtor's property, real and personal. The United States Court of Appeals for the Eighth Circuit stated:

> The Supreme Court has adopted this plain language approach in construing 6321: "The Federal statute relates to the taxpayer's rights to property and not to his creditors' rights." *United States v. National Bank of Commerce,* 472 U.S. 713, 727, 105 S.Ct. 2919, 2927, 86 L.Ed.2d 565 (1985); *accord, United States v. Rodgers,* 461 U.S. 677, 690–91, 103 S.Ct. 2132, 2140–2141, 76 L.Ed.2d 236 (1983). This court and other circuits have as well: "The IRS acquires by its lien and levy no greater right to property than the taxpayer himself has at the

time the tax lien arises." *St. Louis Union Trust Co. v. United States,* 617 F.2d 1293, 1301 (8th Cir.1980). *See also Gardner v. United States,* 34 F.3d 985 (10th Cir.1994) ("the tax collector not only steps into the taxpayer's shoes but must go barefoot if the shoes wear out," *quoting* 4 Boris Bittker, *Federal Taxation of Income, Estates and Gifts* ¶ 111.5.4 (1981)); *Avco Delta Corp. Canada Ltd. v. United States,* 459 F.2d 436, 441 (7th Cir.1972) ("the government's lien does not exceed the rights of the taxpayer").

The Eighth Circuit cited with approval the First Circuit's decision in *United States v. V & E Eng'g & Constr. Co.,* 819 F.2d at 333, in which the court held that a § 6321 lien did not attach to property the taxpayer had sold because the taxpayer no longer had a "right" in the property. The court, however, noted an exception to the general rule in the case of fraudulent conveyances, noting that under state law they are typically void. It observed:

> [A] number of cases have held that the § 6321 lien attached to property conveyed by the taxpayer with the intent to defraud creditors, treating the IRS as a defrauded creditor without considering whether that is the proper focus given the language of § 6321 as construed in *National Bank of Commerce. See United States v. Fernon,* 640 F.2d 609, 612 & n. 5 (5th Cir.1981); *United States v. Jones,* 631 F.Supp. 57, 59 (W.D.Mo. 1986). The contrast between the government's uniform success in fraudulent conveyance cases and the plain language of § 6321 as construed in *National Bank of Commerce* is somewhat troubling. Perhaps a special rule is appropriate in cases of fraud. Or perhaps the lien issue is unimportant because the IRS is in any event a creditor entitled to pursue its remedies under these fraudu-

lent conveyance statutes. *See United States v. Bierbrauer*, 936 F.2d 373 (8th Cir.1991).

66 F.3d at 163.

In this case, the Debtor did not own the real property which the Trustee alleged he fraudulently conveyed at the time the lien of the United States arose. Because of this Court's approval of the Settlement Motion, the Court did not determine that the Debtor fraudulently transferred real or personal property. Moreover, the Court did not determine the source of the settlement funds. The approval of the settlement, which included release provisions favorable to the defendants, including the Debtor, was a final order to which the United States did not object. The Court concludes that the United States has failed to sustain its burden of establishing that its lien attached to the settlement proceeds.

## V. CONCLUSION

In view of the foregoing, the Court hereby sustains Cadle's Objection to the Trustee's Final Report and overrules the Opposition of the United States.